296 So.2d 682 (1974)
James PILCHER
v.
STATE of Mississippi.
No. 47664.
Supreme Court of Mississippi.
June 4, 1974.
Rehearing Denied July 15, 1974.
*683 R. Jess Brown, James E. Winfield, John C. Brittain, Jr., Jackson, for appellant.
A.F. Summer, Atty. Gen. by Ben H. Walley, Asst. Atty. Gen. and Karen Gilfoy, Sp. Asst. Atty. Gen., Jackson, for appellee.
ROBERTSON, Justice:
James Pilcher, an 18-year-old black male, was indicted, tried and convicted in the Circuit Court of Carroll County of the murder of Mrs. Eugenia James, a 49-year-old white female. The jury returned a verdict of guilty as charged, and the court sentenced the defendant to death by lethal gas. Pilcher appeals from the verdict and sentence.
The facts are undisputed. About 5:30 P.M., February 12, 1971, in Carrollton, Mississippi, Pilcher caught a ride with Mrs. James. The temperature was around freezing and a fine misty rain mixed with snow and sleet was falling. According to Sheriff Lagrone Nunley of Carroll County, to whom the defendant confessed about 4:00 P.M., February 13, 1971, this is what happened:
"He said  I caught a ride with Mrs. James last night. I got in the back seat and we were riding up the road and, when I came to these woods, I just lost my head. I picked up an oil can and hit Mrs. James back of the head. It caused her to wreck the car and she ran off the road. Then, I opened my knife and put it on Mrs. James and forced her out of the car into the road. He said  she was screaming and begging me not to do this and I still put the knife on her and made her go down to the fence and she said  you ought not to do this to me. So, I reached around her waist and held the knife against her waist and put my foot on the wire and held up the other wire *684 and told Mrs. James to crawl through. She got on through and, at that time, I forced her down into the woods and, when I got down to the woods, I tore her girdle off and her underclothes and told her, with the knife on her, for her to lay down on the ground. She was still screaming and hollering and begging me not to do it. Then, we scuffled around there and he said  we had an awful struggle  struggling around on the ground there and finally Mrs. James rolled over out from under him and he began stabbing her  and I said  James, how many times did you stab her  and he said  one time, I think. He said he couldn't be sure  that it might have been four or five times I might have, Mr. Nunley, I don't know. He said  as I got up, she was lying still on the ground  just lying there still  and I got up and walked down through the woods and went up on the road and walked by Mr. Pete Holiman's place and threw the knife up on the left bank of the road. I walked on down the road and Mr. Tingle picked me up down about Mr. Stratton's house and brought me into town. Then I said  what did you do then. He said he was there in town and he got Sack  I call him Sack  his name is Willie Roy McNelson. He said  I paid him to carry me out to my brother's house to change those pants and Willie Roy also brought him back to town."
Mrs. James was found about midnight on February 12th and was taken to the emergency room of the Greenwood-Leflore County Hospital. Dr. Raymond W. Browning testified that she was unconscious when brought to the emergency room about 1:00 A.M., February 13th, and his diagnosis was:
"[S]hock and hypothermia secondary to multiple injuries and to exposure to extreme weather conditions or adverse weather conditions."
She lived until March 17, 1971, and died without ever regaining consciousness. Dr. Browning further testified:
"[T]he primary cause of death was a severe brain injury and contributing or secondary causes were exposure to cold, multiple stabbings in the chest and pneumonia."
Dr. Browning stated that she was stabbed seven times, four times in the front chest and three times in the back, with all stab wounds penetrating the thoracic cavity and some penetrating her lungs. Dr. Browning described the blow that inflicted the brain injury in this way:
"She had an extremely severe scalp laceration and a fracture of her skull which was visible on the exposed skull and the fracture was not depressed  just a crack in the skull and the scalp on the entire left side of the head had been detached and was dropping down to the left side exposing approximately half of the skull as well as a part of her face below.
"Q Can you tell the jury, in your opinion, what was the cause of the severe lacerations that exposed her skull?
"A A blow by a blunt instrument."
Clifford Lemley testified that he saw appellant get into Mrs. James' car in front of a store in Carrollton about 5:30 P.M. He followed them for about a mile, until he turned off in another direction. Mike Tingle testified that he was traveling towards Carrollton about 6:45 P.M. when he came upon appellant walking along the road; Tingle picked him up and gave him a ride into town. Elmer Wilson and Alec Beckwith, Jr. saw appellant in Price's Store sometime between 7:00 and 8:00 P.M. and both noticed stains or spots on his trousers.
Willie McNelson, a friend of appellant, testified that appellant paid him to take him to his brother's house to change *685 clothes. McNelson further testified that the stains on the appellant's pants appeared to be blood stains. After appellant changed his pants, McNelson brought him back to town about 8:30 P.M. The next day, Guy Lee Pilcher, appellant's 25-year-old brother, on the advice of his uncle, Buddy Swims, stopped Sheriff Nunley and told him that he had appellant's trousers at his house. They drove to his house and Guy Lee gave the pants to the sheriff.
Herman L. Parrish, Toxicologist of the Mississippi Crime Lab, testified that soil samples taken from the knees of these pants and from knee depressions in the ground where Mrs. James and the appellant struggled were microscopically and spectrographically identical.
There was testimony by M.A. Bass, Jr., a criminologist with the Mississippi Crime Lab, that fibers from appellant's sweater were identical with fibers found on Mrs. James' coat, and that Negroid hair fragments found on the appellant's sweater were identical with those found on Mrs. James' sweater, her slip and girdle.
The assignment of errors filed by the appellant recites:
"I. The 4 month delay between the time of arrest and the date of indictment in which the defendant was never taken before a magistrate, constitutes a grossly unreasonable delay resulting in the denial of due process as guaranteed by the 14th amendment, § 26 of the Mississippi Constitution and § 99-3-17 of the Mississippi Code.
"II. The Honorable Marshall Perry, a publically self-declared segregationist, who exhibited overt hostility toward the defendant and his attorneys, ought to have recused himself upon request by the defense.
III. The trial judge blatantly deprived the defendant of his right to exclude illegally obtained evidence by summarily denying him a full and effective suppression hearing.
"IV. When the Defendant, a black man charged with the rape and murder of a white woman in a sparsely populated rural county, showed that knowledge of the incident had widely spread throughout the county resulting in violent emotional tension and prejudgment of the case along racially polarized lines, the trial court erred when it refused to change the venue.
"V. The brutal, bloody nature of the homocide and rape of the victim, combined with the defendant's motion for a pre-arraignment mental examination on the grounds of the suggestion of insanity, mandated the trial court to submit the defendant for an examination on his competency to stand trial.
"VI. The trial court erred in refusing to grant defendant's motion to exclude the sheriff from the courtroom because he was the state's key prosecution witness as well as the court's bailiff.
"VII. The proceedings against the defendant were so rampant with racial bias and prejudice and rank capriciousness and unreasonableness, so as to shock the conscience and notions of fair play and decency, and deprive the defendant of a fair and impartial trial."
These seven assignments of error have to do primarily with procedural and due process questions.
Honorable Luther S. Gilmer was appointed by the court to defend appellant, and he served in that capacity until March 27, 1971, when the Pilcher family retained Honorable R. Jess Brown and Honorable John C. Brittain, Jr. to defend the appellant. Gilmer executed an affidavit on May 17, 1971, wherein he stated that he advised against a preliminary hearing because of his fear for the safety of his client, James Pilcher, and that in his opinion "the Defendant waived the preliminary hearing because of his fear for his own life."
It must be kept in mind that the appellant fully confessed on February 13, 1971, *686 to a crime that had just been committed on February 12, 1971, the day before. Also, the victim, Mrs. James, lived until March 17, 1971, and the exact charge could not be determined until her recovery or death.
In Harper v. State, 251 Miss. 699, 171 So.2d 129 (1965) the Court was faced with a situation similar to the present case. Harper had not been given a preliminary hearing and, as in the case at bar, had confessed shortly after arrest. This Court commented about the failure to provide a preliminary hearing:
"A preliminary hearing should have been held, by carrying appellant before a magistrate, advising him of the nature of the charge, and permitting him to plead to it, or giving him an opportunity to waive preliminary hearing, if he wished... .
"However, the failure to carry Harper before a judicial officer shortly after his arrest did not entitle him to a directed verdict of not guilty. Without the written confession, the overwhelming weight of evidence reflects defendant's guilt. The evidence as a whole, including the admissible oral confession, is ample to submit the issue of guilt to the jury... . In this case the admissible oral confession was made by Parker almost immediately after his arrest, before any opportunity existed to bring him before a magistrate." 251 Miss. at 704-705, 171 So.2d at 131-132.
In Glass v. State, 278 So.2d 384 (Miss. 1973), this Court stated:
"Appellant was represented by competent counsel and waived preliminary hearing and even if the waiver was not proper, the mere fact that he was not afforded a preliminary hearing without more does not amount to a violation of his constitutional rights and does not vitiate his conviction." 278 So.2d at 387.
To the same effect are McLelland v. State, 204 So.2d 158 (Miss. 1967) and Dunning v. State, 251 Miss. 766, 171 So.2d 315 (1965).
One of counsel for appellant, John C. Brittain, Jr., filed a motion for the circuit judge, Marshall Perry, to recuse himself on December 14th, 1971, after Judge Perry had heard preliminary motions for three days and the trial on the merits was about to begin. In overruling this motion, Judge Perry stated, among other things:
"This Court has, on occasion, stated that, in some areas of life, he believes that the social separation of the races should be maintained and is better for both races. That is to say that there should not be a forced integration brought about by the strong arm of the military department or any other department of the government. That does not, in any wise, mean that this Court is against any person having his full, equal and constitutional rights and, in my eleven years on the bench, there is not one case to prove that the Court thinks otherwise. (Emphasis added)
......
"The Court would like to further state that he never saw the Defendant, so far as the Court knows, until he was brought in the Court last June. He did not know him previously or any member of his family. This Court does not know the James family  the family of the alleged victim  except that he knows some of the collateral relatives of Mrs. James' late husband and only knows them in a very casual way."
Judge Perry did not abuse his discretion in overruling this motion.
The first part of the third assignment of error has to do with the admission into evidence of the pants worn by the appellant the afternoon and night of February 12, 1971. Guy Lee Pilcher, appellant's 25-year-old brother, testified that he flagged down Sheriff Nunley and volunteered to get these pants from his, Guy Lee Pilcher's, home, that he got in the sheriff's car, went to his home and got his brother James' pants and turned them over *687 to the sheriff. He further testified that Sheriff Nunley did not set foot in his (Guy Lee's) home, that his brother, James, kept some clothes at his house, but that James did not live with him and spent no nights there. The appellant had no standing to object to his brother's turning over his (James') pants which James had left at his brother's home.
Appellant also contends under this assignment of error that the trial court in effect prevented him from testifying at the preliminary hearing conducted out of the presence of the jury to determine the admissibility of appellant's oral confession by its ruling on whether cross-examination by the State would be limited to the confession. The court ruled:
"All right. The Court announces this rule. He may take the stand for the purpose of testifying as to the admissibility of his confession. The District Attorney or the State may cross-examine him only as to that and incidents or matters that are reasonably incident thereunto and I'll have to rule on those matters as they come up." (Emphasis added).
The appellant refused to testify at the preliminary hearing out of the presence of the jury after the judge announced this rule. We hardly see how the court could have ruled otherwise at this stage, and we do not think that the trial judge denied the appellant any of his rights when he announced this rule.
The fourth assignment of error was that the trial court erred in refusing to change the venue. This motion was argued on December 7, 1971. A chronology of events would be in order here. The crime was committed on February 12, 1971. The appellant was arrested on February 13, 1971, and placed in the Carroll County jail. Soon after that he was sent to the State Penitentiary at Parchman, Mississippi, for safekeeping and remained there until he was returned to the Carroll County jail on June 10, 1971, for a hearing on the preliminary motions which was originally set for June 14, 1971. Appellant was indicted June 14th, and pleaded "Not Guilty".
On June 15, 1971, appellant filed a Petition for Removal in the United States District Court for the Northern District of Mississippi, and on June 16, 1971, Judge Perry entered an order holding everything in abeyance until the United States District Court acted on the Petition before it. The United States District Court denied the Petition for Removal about October 29, 1971. The circuit court by agreement set the preliminary motions for hearing to begin on December 7th. The trial on the merits finally began on December 14, 1971. In the meantime, appellant had been in the Carroll County jail from June 10th until December 14, 1971, without incident and without any hint of violence.
On this motion for a change of venue, all five members of the Board of Supervisors, Sheriff Nunley and Deputy Sheriff Michie testified that they had seen little publicity about the case and that they had heard very little discussion of it throughout the county, and that in their opinion appellant could get a fair and impartial trial in Carroll County. Appellant offered witnesses who testified to the contrary. We note from the record of the complete voir dire examination of jurors that no great difficulty seems to have been experienced in selecting and accepting a jury to try the case. In the recent case of Parks v. State, 267 So.2d 302 (Miss. 1972) this Court said:
"[I]t has long been the law in this state that: `The granting of a change of venue is a matter so largely in discretion of the trial court that a judgment of conviction will not be reversed on appeal on the ground that a change of venue was refused, unless it clearly appears that trial court abused its discretion.' The trial judge in the case at bar had the opportunity to view the prospective jurors, watch their demeanor and form an opinion as to whether or not a fair trial could be given in the county." (Emphasis added). 267 So.2d 304.
*688 It does not appear to us that the trial judge abused his discretion when he overruled the motion for a change of venue, which motion was heard 10 months after the commission of the crime, and after the appellant had been in the Carroll County jail for the five months preceding trial without incident, hint of violence or any suggestion from his counsel of any fear for his safety.
The fifth assignment of error was that the trial court erred in not ordering a psychiatric examination of the appellant. The state produced a number of witnesses who had been in close contact with the appellant who testified that he was perfectly sane, competent and rational and the only evidence contra was offered by the appellant's mother who testified that the appellant at times liked to be by himself, and that at times he had headaches and an upset stomach, but that she had never consulted a doctor or had a doctor treat him for his stomach upsets or headaches.
This Court in McLeod v. State, 229 So.2d 557 (Miss. 1969), stated this rule:
"It is the purpose of this statute to assure that a defendant is mentally capable of standing trial and is able to confer intelligently with his attorney in the preparation of his defense. Evidence of the probability that the accused is unable to assist in his own defense must be presented. Frierson v. State, 250 Miss. 339, 165 So.2d 342 (1964). The trial judge has reasonable discretion in determining whether the accused should be examined by a psychiatrist. King v. State, 210 So.2d 887 (Miss. 1968)." (Emphasis added). 229 So.2d at 559.
No evidence was adduced that appellant was not mentally capable of standing trial or that he was not able to confer intelligently with his attorney in the preparation of his defense. The trial judge did not abuse his discretion in denying the accused a psychiatric examination in light of the complete absence of testimony of any mental or psychological disability.
Appellant next complains that the trial court erred in overruling his motion to exclude the sheriff from the courtroom because he was a material witness for the state. After examination by the court and counsel for the appellant, two jury bailiffs, not related to the appellant or the victim and having no interest in the case, were selected by the court and fully instructed as to their duties in attending the jury.
The sheriff had no duties to perform with reference to the jury and remained in the courtroom as the chief law enforcement officer of the county to attend the court and to preserve order. In overruling the oral motion of the appellant to exclude the sheriff from the courtroom, the court said:
"The Court has ruled in Open Court that the Sheriff is exempt from the rule because his presence in the Courtroom is needed. The Court has also announced that all Deputy Sheriffs and other officers who testify must go under the rule. I feel that, in a capital case, this exemption to the rule should apply only to the Sheriff and not to other officers."
The trial court did not abuse its discretion in allowing the sheriff to remain in the courtroom during the trial and perform his general duties as chief law enforcement officer of the county.
This Court has carefully read, studied and considered the seven volumes (1384 pages) of record in this case, and is of the opinion that the appellant received a fair and impartial trial. This is all that the appellant or any other accused is entitled to. Because of human frailty it would be absolutely impossible to conduct a perfect trial, and the law very wisely does not require such.
We affirm the conviction but remand this case to the trial court for resentencing *689 in line with the decision of this Court in Myers v. State, 268 So.2d 353 (Miss. 1972).
Conviction affirmed but remanded for resentencing.
GILLESPIE, C.J., and PATTERSON, SMITH and SUGG, JJ., concur.